IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH NORTHERN DIVISION

| | |
|---|---|
| NOVUS FRANCHISING, INC., a Washington State corporation<br><br>            Plaintiff,<br><br>      v.<br><br>GARY N. BROCKBANK, an individual MARILEE BROCKBANK, an individual, JEFFERY L. PALMER, an individual, G.A.M.E.1 INC., a Utah corporation, JOHN DOES 1-10<br><br>            Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANTS**<br><br><br>Case No. 1:16-CV-00078<br><br><br>Judge Clark Waddoups |

This matter is before the court on a motion for preliminary injunction filed by Novus Franchising, Inc. (Novus). (Dkt. No. 9). Novus seeks to enforce the non-compete provision of a franchise agreement against its former franchisee, Gary Brockbank, and Mr. Brockbank's wife and step-son, stop defendants' use of a confusing trademark, and protect its trade secrets and confidential information. After briefing from the parties, the court held a hearing on the motion on August 30, 2016 and took the motion on submission. (Dkt. No. 35). For the reasons explained below, the court now DENIES Novus' motion.

## I.      BACKGROUND

Plaintiff Novus Franchising, Inc. is a national windshield repair company who franchises its proprietary Novus® System to franchisees who operate automobile glass repair and

replacement businesses using Novus's processes, business systems, trademarks, service marks, slogans, and logos. Defendant Gary Brockbank is a former Novus franchisee. The parties dispute Mr. Brockbank's history as a franchisee of the company.

Novus originally alleged that Gary Brockbank did not operate an auto glass windshield repair or replacement business prior to his relationship with Novus; he subsequently learned how to repair auto and other glass only by virtue of his contractual relationship with Novus. (Dkt. No. 8, p. 8; Dkt. No. 16, p. 25). Novus further claimed that Mr. Brockbank had been a franchisee with Novus since approximately 1993, receiving training, support, operational procedures, access to material and product suppliers who provided national account discounts, and use of the Novus mark. (Dkt. No. 16, p. 7). Over the years, according to Novus, Mr. Brockbank acquired up to 13 mobile repair unit franchises. Most recently, he renewed eight mobile repair unit franchises on February 1, 2008, serving a seven-county area of primary responsibility until May 26, 2016, when Novus terminated his franchise agreement for failure to pay royalties and submit gross revenue reports on a monthly basis. (Dkt. No. 16, pp. 7, 10-11). After his termination, Novus claims that Mr. Brockbank continued to use the Novus name, marks and suppliers, that he established a competing business using the name, "You Know Us Auto Glass," that was calculated to generate trademark confusion and exploit the goodwill associated with the Novus mark, and that his retention of operating manuals implies a threat that he will reveal Novus' trade secrets and/or confidential information. (*Id.* at pp. 12-14).

Mr. Brockbank tells a different story. He claims that he was trained by his father in the automobile glass repair and replacement business in approximately 1978, after which he began operating a business under the name of "Gary's Glass Repair." (Dkt. No. 27-1, p. 3). In

approximately 1980, he states he changed the name of the business to "Glass Doctor," and sometime thereafter re-registered the name "Glass Doctor Windshield Repair" as a DBA with the State of Utah. (*Id.*) He states that he began purchasing resin for glass repair from a company he believed was affiliated with the Novus family of companies. (*Id.*) In approximately 1981, he claims to have acquired two subcontractors (Matthew Thomas and Rawlee Perkins) whom he trained to perform auto glass repair. These subcontractors paid him a portion of their revenue in exchange for training and business leads. (*Id.*) This relationship continued for decades until May 2016 when Novus terminated his franchise and, according to Mr. Brockbank, interfered with his subcontractor arrangement such that they no longer pay him a portion of their revenue. (*Id.* at p. 8).

Mr. Brockbank asserts that his formal franchisee relationship with Novus began around 1988, when he acquired a Novus auto glass repair franchise, to be distinguished from an automobile glass *replacement* franchise. (Dkt. No. 27-1, p. 3). Mr. Brockbank also states that he informed Novus of his existing subcontractor relationships at the time he acquired his first franchise in 1988, and that Novus did not object. (*Id.*). He further states that Novus did not offer glass replacement franchises at the time he began his franchisee relationship. He alleges that this was deliberate on the part of Novus because it allowed them, in marketing their services to automobile insurers, to demonstrate they had no financial incentive to perform more expensive replacements rather than repair of glass windshields. (*Id.*)

Mr. Brockbank also alleges that Novus did not provide him with training or assistance in the operation of his mobile repair business. (Dkt. No. 27-1, p. 6). Although he received Novus' operations manuals, he claims that he never read the manuals, does not know their contents, and

returned them in mid-June 2016, within weeks of Novus terminating his franchise. (*Id.*). He

further states that after acquiring his Novus glass repair franchise in 1988 he continued to

provide auto glass replacement services, and that his Novus franchise Sales Volume and Royalty

Reports dated April 1998 make it clear that his franchise was for Novus Windshield Repair, and

that replacement sales were "Not Applicable" to his franchise. (*Id.* at pp. 4, 17).

  In late 1998, Mr. Brockbank states that Richard Inman, who Mr. Brockbank understood

was either the President or Vice President of Novus, contacted him to inform him that they had

changed their policy about glass replacement franchises. (Dkt. No. 27-1, p. 4). Mr. Inman

allegedly indicated that Novus now offered glass replacement franchises and invited Mr.

Brockbank to become a glass replacement franchisee. Mr. Brockbank claims he declined for

several reasons:  First, because he had already developed a strong glass replacement business and

did not want it to become subject to a noncompete requirement; second, because Novus had not

assisted him in developing his repair business notwithstanding his nearly 10-year repair franchise

relationship with them, and third, because he believed that the margins of the glass replacement

business would not support the payment of a franchise fee. (*Id.*, pp. 4-5).

  Mr. Brockbank claims that after declining Mr. Inman's offer he was told that he would be

required to operate his glass replacement business under a different name from his Novus repair

franchise. (Dkt. No. 27-1, p. 4). However, several weeks later, Mr. Inman reportedly contacted

him again and stated that because Novus wanted to advertise that it could provide glass

replacement services in the Salt Lake area, Novus now preferred that he operate his glass repair

and replacement businesses under the Novus name. (*Id.*). When Mr. Brockbank declined again to

place his glass replacement business under a Novus franchise agreement, Mr. Brockbank alleges

that Mr. Inman proposed that he operate his glass repair and replacement businesses under the Novus name, but that Novus would separate the replacement business from the repair franchise by excluding a high dollar amount of gross monthly revenue (in the amount of $79,666.00, known by the parties as the "Base Replacement Sales" exclusion) generated by Mr. Brockbank's automobile glass replacement business from any requirement to pay royalty fees to Novus. (*Id.*, pp. 4-5). Further, Mr. Inman reportedly stated that the replacement business would not become a part of the Novus franchise unless Novus assisted Mr. Brockbank in generating that high dollar amount of gross monthly revenue. Mr. Brockbank claims that not once since then was he able to generate glass replacement business sales at the dollar amount required to make his replacement business part of the Novus franchise. (*Id.*, p. 5)

Accordingly, during the ensuing years, Mr. Brockbank claims that he operated his glass replacement and repair businesses under the Novus name and paid Novus many hundreds of thousands of dollars in glass repair franchise fees. (Dkt. No. 27-1, p. 6). He alleges that Novus did not assist him in expanding his repair or replacement businesses, never provided any dealer or fleet accounts, and that they even allowed other Novus franchisees to operate in his service territory. (*Id.*) He also claims that throughout his time as a Novus franchisee, the majority of his contacts with Novus were when they communicated to him that that they intended to sell additional franchises in his service area unless he bought the franchises to avoid competition. This practice, Mr. Brockbank alleges, eventually led him to purchase so many franchises that he could no longer pay the demanded minimum franchise fees. (*Id.* at pp. 6-7).

Mr. Brockbank states that at this time he began contacting Novus to ask that they reduce the number of his franchises so that he could afford his franchise fees. (Dkt. No. 27-1, p. 7). He

claims that he received assurances that they would do so. Nevertheless, in December 2015, Novus sent Mr. Brockbank its first payment demand letter for outstanding franchise fees. Mr. Brockbank indicates he has serious doubts about the accuracy of Novus's accounting and claims of money he still owes. (Dkt. No. 27-1, p. 9). Several weeks later, Mr. Brockbank states that he met with Novus representative Scott Rethwill, who informed him that Novus would reduce his franchises down to two and that his minimum franchise fee would be reduced to $700 per month ($350 per franchise). (Dkt. No. 27-1, p. 7). Mr. Rethwill also allegedly proposed that Mr. Brockbank continue to repay the outstanding balance owing in monthly installments of $2,800 (the amount of his prior minimum franchise fees) through the end of 2016, at which time he should pay off the balance in one lump sum payment. Mr. Brockbank agreed and claims that the parties shook hands on this deal. (*Id.*)

Afterwards, according to Mr. Brockbank, Mr. Rethwill asked whether he thought his two subcontractors would be interested in becoming Novus franchisees. (Dkt. No. 27-1, p. 8). Although Mr. Brockbank did not think so, Mr. Rethwill allegedly offered Mr. Brockbank a $10,000 credit per person toward his outstanding franchise fees if he could persuade his two subcontractors to become franchisees. Later, Mr. Rethwill and Keith Beveridge of Novus allegedly informed Mr. Brockbank that his subcontractors had agreed to become Novus franchisees. Mr. Brockbank expected a $20,000 credit toward his outstanding fees. He later learned, however, that his subcontractors had not agreed to become Novus franchisees, in part because Novus allegedly falsely represented to them that Mr. Brockbank had not paid his franchise fees in 2015, told them that their subcontract relationship with him was illegal and that

they needed to stop paying Mr. Brockbank, and that Novus intended to have its attorneys "make an example" of Mr. Brockbank and drive him out of business. (*Id.*).

Mr. Brockbank received Novus' franchise termination letter around May 26, 2016. (Dkt. No. 27-1, p. 9). Within a short time of being terminated, Mr. Brockbank claims that he returned the Novus operating manuals, stopped using the Novus name, stopped using Novus branded invoices, destroyed all Novus-branded signs and other materials, and informed his regular customers and suppliers that he is no longer a Novus franchisee. (*Id.* at pp. 9-10). Instead, he focused his own efforts back into providing automobile glass replacements, which he claims has always been separate from his Novus franchise. (*Id.* at 10). He indicates that he had never leased any of Novus's equipment and is similarly not using any of its allegedly confidential information or chemicals in his glass replacement business. (*Id.* at 9). His wife and step-son, Jeffery Palmer, however, who had worked with him for many years in the glass repair and replacement business, but had never signed the Novus franchise agreement, opened their own auto glass business under the name "You Know Us Auto Glass."  (Dkt. No. 27-2, p. 3; Dkt. No. 27-3, p. 3). This came about in the following way:  In 2007, Mr. Brockbank and his wife incorporated a company known as G.A.M.E.1, Inc. in the state of Utah for the purpose of glass repair and replacement. (Dkt. No. 9-5, p. 5). There is no evidence in the record that a separate glass repair and replacement business was actually functioning under this company name until after Novus terminated Mr. Brockbank's franchise. However, on June 7, 2016, Mr. Brockbank alleges that he relinquished his interest in G.A.M.E.1. (Dkt. No. 27-1, p. 10). Mrs. Brockbank then became the president and Jeffrey Palmer became the vice president and director of G.A.M.E.1. (Dkt. No. 9-5, pp. 7-8). G.A.M.E.1 chose the name "You Know Us Auto Glass" for the auto glass repair and

replacement business because, according to Mrs. Brockbank, she and her son have lived in Bountiful for most of her life and all of his life and the people there know them. (Dkt. No. 27-2, pp. 3-4).

The "You Know Us Auto Glass" has a different logo design and feel from the Novus marks Mr. Brockbank had been using. (Dkt. No. 27-1, pp. 35-29; Dkt. No. 27-2, pp. 10-14). The byline for "You Know Us Auto Glass" is "Try Us Once – Customer for Life" compared to Novus' bylines of "The Windshield Repair Experts" and "We Invented Windshield Repair." (*Id.*). Mrs. Brockbank states that she has never received training or instruction from Novus, including never having read Novus' operation manuals or acquired any information about what is contained in them. She also denies ever using Novus' urethane product in her business. She states that she has purchased business signs, cards, and invoices for "You Know Us Auto Glass" and does not use the name Novus or any of Novus' trademarks. Additionally, she states that she is not aware of any person who has confused "You Know Us Auto Glass" with the former Novus franchise. (Dkt. No. 27-2, pp. 3-4). Similarly, Mr. Palmer states that he has never received Novus training or instruction, never read the Novus operating manuals, has no awareness of the contents of those manuals, and that the business is not using any of Novus' marks, trade secrets or confidential information. (Dkt. No. 27-3, pp. 3-4). Both Mrs. Brockbank and Mr. Palmer state that Mr. Brockbank does not participate in the "You Know Us Auto Glass" repair business and has only been at their "You Know Us Auto Glass" business location once since the termination of the Novus franchise, and that was to take pictures for the purposes of this litigation. (Dkt. No. 27-2, p. 4; Dkt. No. 27-3, p. 4).

Finally, all of the defendants allege that they have been working exclusively in the auto glass business for the majority of their working lives. Given the ages of Mr. and Mrs. Brockbank (58 and 63, respectively), and the lack of any other employment history for Mr. Palmer, the defendants allege that restricting them from working in the auto glass industry for a period of two years would almost certainly destroy their means of providing for their support and lead to bankruptcy and their inability to obtain replacement employment. (Dkt. No. 27-1, p. 10; Dkt. No. 27-2, pp. 4-5; Dkt. No. 27-3, p. 3).

After receiving Mr. Brockbank's opposition memorandum and supporting affidavits, Novus then changed its factual allegations before the court. Now, Novus asserts through Mr. Beveridge, who has only been with the company since 1997, that Mr. Brockbank has been a franchisee since 1986 (not 1993 as originally alleged), and that before that beginning around October 1979 he had a licensee relationship with Novus' prior owners. (Dkt. No. 33-1, p. 7). Mr. Beveridge states that beginning in April 1986, Mr. Brockbank had multiple 5-year repair-only franchise agreements with Novus that were renewed in November 1991. (*Id.* at 8). In February 1998, Mr. Beveridge states that Mr. Brockbank renewed his repair-only franchise agreements for 10 years, and that on July 1, 1998, Mr. Brockbank executed an addendum to multiple 10-year repair-only franchise agreements to amend the franchise agreements such that glass replacement could now be offered under the Novus name and marks. (Dkt. No. 33-1, p. 8; Dkt. No. 33-1, p. 29-30). Mr. Beveridge also asserts that Mr. Inman had been long-retired from Novus by 1998.[1] (*Id.*). Finally, Mr. Beveridge asserts that when Mr. Brockbank renewed the 10-year franchise agreements in February 2008, they were *repair and replacement* agreements. (Dkt. No. 33-1, p.

---

[1] It does not appear that the addendum was signed by Mr. Inman for Novus. On the other hand, Mr. Brockbank did not assert that his agreement with Mr. Inman was in writing.

8). Based on this history, Mr. Beveridge denies that the blank "Base Replacement Sales" boxes in Mr. Brockbank's copy of royalty reports is evidence that his glass replacement business is outside of the franchise agreement. (*Id.* at pp. 8-9). Rather, Mr. Beveridge states, the addendum is evidence that the replacement business was intended to be inside the franchise agreement from 1998 forward, and that the replacement sales base figure merely exempted glass replacement business royalty payments if revenue was less than a certain base dollar amount. (*Id.*).

Mr. Beveridge also disputes several other factual allegations by Mr. Brockbank. For example, he states that Novus provided original training in glass repair to Mr. Brockbank and that subsequently Novus has provided training to Mr. Brockbank at regional meetings and annual conventions. (Dkt. No. 33-1, p. 3-4). He states that Novus provided training to at least eight employees of Mr. Brockbank. (*Id.* at 4). He states that Novus offered marketing, sales and expansion help with things such as servicing national accounts, and that Mr. Brockbank never opted to participate in those programs. (*Id.* at 9). He denies that Novus ever threatened or forced Mr. Brockbank to acquire new franchises; rather, Mr. Brockbank's agreements do not provide for exclusive territory, so Novus merely informed him of expressions of interest from potential franchisees and Mr. Brockbank chose to secure his areas by purchasing additional franchises. (*Id.* at 9-10).

Mr. Beveridge also claims that Mr. Brockbank had not repeatedly asked to reduce the number of his franchise agreements. (Dkt. No. 33-1, pp. 10-11). To the contrary, after a Novus audit in 2014, Mr. Beveridge claims Novus learned that Mr. Brockbank was subcontracting or sub-franchising out portions of his service areas to be served by his subcontractors, to whom he sold Novus resin, all in violation of the franchise agreements. (*Id.*). He states that he and Ted

Anderson met with Mr. Brockbank in December 2014, told him he must stop subcontracting/sub-franchising, and suggested he reduce the number of his franchises. According to Mr. Beveridge, Mr. Brockbank refused to reduce his number of franchises at that time. (*Id.*).

Mr. Beveridge also disputes the alleged agreement that Mr. Brockbank claims the parties reached at the February 2016 meeting, as does Mr. Rethwill. (Dkt. No. 33-1, pp. 11-12; Dkt. No. 33-2, pp. 4-5). They agree that a meeting took place, but that it focused on Mr. Brockbank reducing his franchise agreements as part of their insistence that he cease the subcontracting/sub-franchising arrangements, and that instead Novus would sign on Mr. Thomas and Rawlee Perkins as new franchisees for the areas they were servicing. Mr. Brockbank would then continue to pay down his royalty debt to Novus and operate under only two franchise agreements. (*Id.*). Mr. Beveridge similarly denies making threatening statements to Mr. Thomas and Mr. Perkins as alleged by Mr. Brockbank, such as threats to make Mr. Brockbank an example and drive him out of business.[2] (Dkt. No. 33-1, p. 12). Mr. Beveridge claims that Mr. Thomas informed him that he and Mr. Brockbank own the building at 343 North Main Street in Bountiful, Utah where "You Know Us Auto Glass" is now operating, and that the business pays sub-market rent for the location. (*Id.*).

Mr. Rethwill of Novus also provided additional detail regarding Novus's efforts to re-franchise the area and the new franchisees Novus has been unable to sign allegedly because of Mr. Brockbank's influence and competing business in the area. He reiterates that Mr. Brockbank's former subcontractors, Mr. Thomas and Mr. Rawlee Perkins, were not interested in franchising directly with Novus unless they could have a glass replacement sales base that would

---

[2] This denial is refuted by Matt Thomas, who filed a declaration on August 30, 2016 that the court did not review until after the hearing. (Dkt. No. 34, p. 3).

be exempt from royalties. (Dkt. No. 33-2, p. 5). Additionally, he stated that a Las Vegas franchisee of Novus, Mr. Jim Perkins, the brother of Rawlee Perkins, is interested in returning to Utah and acquiring the Salt Lake City metro area Novus franchise territory. (Dkt. No. 33-2, p. 3). Jim Perkins' plan, however, depended on having his brother, Rawlee, and Mr. Thomas run the area until he could "eventually" return to Utah.[3] (*Id.*). Jim Perkins is allegedly the source of Mr. Rethwill's information that Mr. Thomas and Mr. Perkins were each paying Mr. Brockbank $3000 per month to operate auto glass repair and replacement businesses using the Novus® System, including its resin.[4] (*Id.*, p. 4). Mr. Rethwill goes on to allege that "because Brockbank has successfully intimidated Thomas and Rawlee Perkins, they refuse to be employed by Jim Perkins and run the territory,"[5] thus thwarting Novus' re-franchising efforts. Novus's efforts to re-franchise the area with its "warm leads" of the Perkins brothers and Mr. Thomas has been supplemented only by placing advertisements in the area, following franchise portal leads generated through online franchise advertisements, and compiling a list of automotive-related shops to target in the geographic area. (*Id.*).

---

[3] At the hearing on this matter, during the parties' discussions about evidence related to the amount of royalties actually owed by Mr. Brockbank, Novus revealed that it had received Mr. Jim Perkins' expressions of interest in acquiring the Salt Lake metro area territory prior to Novus' termination of Mr. Brockbank's franchises for alleged failure to pay royalties.

[4] Mr. Thomas denies that he or Mr. Rawlee Perkins have ever paid Mr. Brockbank more than $550 per month, and that was to use the resin Mr. Brockbank acquired through his Novus affiliate. (Dkt. No. 34, p. 3). The court cannot determine from the record whether Mr. Brockbank actually purchased Novus's proprietary formula and resold it to his subcontractors, or whether he purchased another resin, variously described as urethane, that Mr. Beveridge states "is a non-Novus product sold by an affiliate of Novus." (Dkt. No. 33-1, p. 12).

[5] Mr. Thomas also denies Mr. Beveridge and Mr. Rethwill's allegations that he turned down an offer to become a Novus franchisee because he was threatened by Mr. Brockbank or was afraid of what Mr. Brockbank would do to him personally or as a business. (Dkt. No. 34, pp. 3-4).

Finally, Mr. Beveridge alleges that the confidential operating manuals that were allegedly returned to Novus by Mr. Brockbank in June actually went to a business address Novus had abandoned over two years ago—and that Mr. Brockbank had notice of the change of address before he mailed the manuals there. (Dkt. No. 33-1, p. 4).

On the basis of the above alleged violations, Novus asked the court to issue a preliminary injunction, enjoining all defendants from directly or indirectly:

- "Competing with Novus for a period of two years, including from owning, operating, leasing, franchising, licensing, conducting, engaging in, consulting with, being connected with, having any interest in, or assisting any person or entity engaged in any business that is in any way competitive with or similar to any business that installs, replaces or repairs automotive or other glass[6] in the following geographical areas:"

    a.  Salt Lake, Tooele, Summit, Wasatch, Davis, Utah, and Weber counties;

    b.  "Any area of primary responsibility for any Novus franchise or business;" and

    c.  "Within ten miles of any business location of a Novus franchise or business."

- "Using Plaintiff's operating manuals, techniques, and other confidential information;"

- "Using or displaying, directly or indirectly, the Novus trade names, registered trademarks, or any similar names, including "You Know Us;"

- "Using or displaying, directly or indirectly, Plaintiff's trademarks or any similar to the Novus® Marks, including the stylized 'You Know Us Auto Glass'" signage currently posted at the business.

---

[6] At the hearing, Novus stipulated that it would seek only to enjoin competition in the specific area of automobile glass.

- "Infringing Novus' registered Marks;"

- "Suggesting any connection between Novus and "You Know Us" services and products in connection with the offer and sale of automotive glass repair and replacement products and services;"

and to direct the defendants to:

- "Cease operating the automotive glass repair and replacement business presently located at 343 North Main Street, Bountiful, Utah, and all mobile units" associated with that business;

- "Assign the telephone numbers and directory listings" associated with defendants' automotive glass repair and replacement business to Novus;

- "Cease using and return Plaintiff's operating manuals;" and

- "Cease using and return or destroy all tangible materials bearing Plaintiff's trade names and trademarks and similar marks (including "You Know Us")."

(Dkt. No. 16, pp. 2-4).

Novus also seeks its attorneys' fees and costs for bringing the motion for injunctive relief.

## II.     ANALYSIS

For the court to grant a motion for a preliminary injunction, Novus must establish that "(1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). Novus seeks an injunction to restrain defendants from operating a glass repair and replacement

business, which would alter the status quo between the parties, or in other words, will "change[]

the last peaceable uncontested status existing between the parties before the dispute developed."

*Id.* at 1071 (internal quotations omitted). Novus also requests that the court order defendants to

perform additional affirmative acts and take a specified course of conduct, making Novus's

request one for a mandatory preliminary injunction.

Mandatory injunctions and injunctions that alter the status quo between the parties are

disfavored under Tenth Circuit law, and require plaintiffs to "satisfy a heightened burden" that

strongly shows that they are substantially likely to prevail on the merits and that the balance of

harms tips in their favor. *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d

973, 976 (10th Cir. 2004). The Tenth Circuit has cautioned that "a preliminary injunction is an

extraordinary remedy" that "is the exception rather than the rule." *Id.* at 999 (internal quotation

marks omitted). Accordingly, the right to relief must be "clear and unequivocal," *Valley Cmty.*

*Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1084 (10th Cir. 2004). The burden here is on the

plaintiff to put forth the evidence required to make that showing. *Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("The burdens at the preliminary

injunction stage track the burdens at trial.")  On the record before the court, the court concludes

that Novus has failed to make the required strong showing to entitle it to preliminary injunctive

relief.

### A.  Likelihood of Success

The court begins by considering the likelihood of success on the merits of Novus' claims

before turning to the remaining preliminary injunction elements.

**1. Likelihood of Success on the Merits of the Non-Compete Breach of Contract Claims**

Novus has not strongly shown that it is substantially likely to prevail on the merits of a breach of the non-compete clause of the franchise agreement. The parties' franchise agreement requires the application of Minnesota law to claims not governed by the United States Trademark Act of 1946 (Lantham Act, 15 U.S.C. § 1051 *et seq*). (Dkt. No. 8-1, p. 50). "Under Minnesota law, courts uphold non-compete agreements that are for the protection of the legitimate interest of the party in whose favor [they are] imposed, reasonable as between the parties, and not injurious to the public." *Anytime Fitness, LLC v. Edinburgh Fitness LLC*, 2014 U.S. Dist. LEXIS 50337 (D. Minn. Apr. 11, 2014).

> **d.** *Novus has not strongly shown that any of the defendants have breached the non-compete agreement.*

To begin with, defendants raise the issue of whether the non-compete agreement is applicable to any of them. As for Mrs. Brockbank and Mr. Palmer, the Novus franchise agreement purports to bind the franchisee as well as "the members of your and their Immediate Families" from competing against Novus. *Franchise Agreement*, ¶¶ 22.2-22.3. Mrs. Brockbank and Mr. Palmer argue that neither of them signed a franchise agreement and Mr. Brockbank did not have any authority to bind them to this clause and, further, that another court interpreting the Novus franchise agreement specifically struck this provision binding the franchisee's family members. *See Novus Franchising, Inc. v. Superior Entrance Systems, Inc.*, 2012 U.S. Dist. LEXIS 182460, 4-5 (W.D. Wisc. Dec. 27, 2012). Minnesota law provides that "as a general rule, nonparties to a contract acquire no rights or obligations under it," *Woodruff v. 2008 Mercedes*,

831 N.W.2d 9, 14 (Minn. Ct. App. 2013), which provides support for defendants' assertion that Mr. Brockbank could not bind his family members to this clause.[7]

For its part, Novus claims that although Mr. Brockbank is the only signatory to the non-compete agreement, courts around the country have also enforced non-compete agreements against non-signatories who knowingly participate or aid another in violating a non-compete agreement. (Dkt. No. 16, p. 17, citing Indiana, Illinois, Florida, and Washington cases).[8] Novus did not cite and the court was unable to locate Minnesota law supporting this argument; however, pursuant to this line of reasoning, the court further considers whether Mrs. Brockbank and Mr. Palmer can be enjoined from competing against Novus by evaluating whether Mr. Brockbank himself is violating the non-compete clause such that his family members' actions can be seen as aiding such violations.

Mr. Brockbank asserts that his glass replacement business was never subject to the non-compete agreement because it was never a part of his franchise agreements. Furthermore, Mr. Brockbank asserts that following termination of the Novus glass repair franchise agreements he

---

[7] Defendants also point out that Novus has long known of Mrs. Brockbank and Mr. Palmer's involvement as Mr. Brockbank's employees and could have required them to sign the franchise agreement, because Novus has at times required other family members to execute the franchise agreement. (Dkt. No. 27, p. 22). *See Novus Franchising, Inc. v. Livengood*, 2012 U.S. Dist. LEXIS 2610 (D. Minn. Jan. 9, 2012).

[8] Relevant factual and legal differences exist that suggest these 30-plus-year-old old cases may not apply to the facts here. *McCart v. H & R Block*, 470 N.E.2d 756, 760 (Ind. Ct. App. 1984) (court enforced a non-compete covenant against husband of former franchisee where husband was also previously an H & R block franchisee); *Arwell Division of Orkin Exterminating Company v. Kendrick*, 267 N.E.2d 352 (Ill. Ct. App. 1971) (court enforced a non-compete covenant against wife of former franchisee based on a finding that she was an alter ego of her husband in conducting the business); *Temporarily Yours— Temporary Help Services, Inc. v. Manpower, Inc.*, 377 So.2d 825 (Fla. Ct. App. 1979) (court enforced a non-compete provision in an employment contract against a corporate entity where the president and only operating officer was the former employee); *Madison v. LaSene*, 268 P.2d 1006 (Wash. 1954) (court enjoined a father and son from operating an upholstery shop when the father sold the goodwill associated with his last name to a competitor but then opened a competing shop nominally owned by his son in the same building using the same family name).

abandoned his interest in G.A.M.E.1, which only then began operating the "You Know Us Auto Glass" glass repair and replacement business under the direction of Mrs. Brockbank and Mr. Palmer. He claims that because he is not violating the non-compete clause for either the glass repair or replacement business, Mrs. Brockbank and Mr. Palmer's operation of a glass repair and replacement business that does not infringe on the Novus system or marks cannot be assisting him to violate the clause.

Novus challenges Mr. Brockbank's assertions on several fronts; however, the court is not persuaded that the quality of Novus's contrary evidence allows it to satisfy the strong showing required by the heightened standard.[9]  For example, Novus claims that Mr. Brockbank's signature on the 1998 Windshield Replacement Franchise Addendum proves that thereafter Mr. Brockbank's replacement business was part of the franchise agreements. The court cannot as easily dismiss Mr. Brockbank's contrary testimony that former Novus representatives asked Mr. Brockbank to convert his independent replacement business into a Novus replacement franchise, and when he declined, agreed to allow him to operate his replacement business outside of the franchise agreement and to exclude such revenue from its royalty calculations in exchange for the ability to market his glass replacement services under the Novus name. Mr. Brockbank further testified that he had an agreement with this Novus executive that his glass replacement business would not become a part of the franchise agreement, even though Novus wanted him to use the Novus name and mark, unless his revenue from such services exceeded $79,666, which it never did. At this stage, Mr. Brockbank's testimony is plausible, because Novus has never had

---

[9] While the Federal Rules of Evidence do not apply to preliminary injunction hearings, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003), the court retains the discretion to evaluate the "salience and credibility" of affidavits and other evidence in support of the motion. *Id.*

any other franchisees in the area and the ability to market both repair and replacement services under the Novus name could have merited the special arrangement Mr. Brockbank claims. Furthermore, the 1998 addendum itself does not contradict Mr. Brockbank's testimony by specifically stating that the replacement business is a part of the franchise agreement; rather, it provides the right for Mr. Brockbank to offer glass replacement services under the Novus name and marks and states he will not offer such services under any other name.

In addition, the 1998 replacement addendum has been long expired and is not per se applicable to the 2008 renewal agreement. Novus argues that the 2008 franchise renewal documents on their face refer to the franchise as a "repair and replacement" agreement. In conjunction with the 1998 amendment showing intent, Novus claims, this is definitive evidence that Mr. Brockbank's glass replacement business is a part of the franchise. Upon a closer examination of the 1998 Windshield Replacement Franchise Addendum, however, reference is made to deletion of a "Repair Only Franchise Addendum." (Doc. No. 33-1, p. 29). This suggests to the court that Novus' standard franchise agreement contains both "repair and replacement" language routinely and therefore the contract language on its face may not accurately reflect the actual agreement, addendums, or understandings between the parties. On this record, the court cannot find that Novus has made a strong showing that Mr. Brockbank's glass replacement business is a part of the franchise agreements.[10] Thus, even if the court were to agree with Novus that the law can bind Mr. Brockbank's non-signatory family members, it has not made a strong showing that they are aiding him in any violation as to the glass replacement business.

---

[10] Novus claims in its reply memorandum that it reviewed corporate history in support of its position, but that evidence was not brought before the court.

As for the glass repair business, Novus makes a two-fold argument that Mr. Brockbank is violating the non-compete agreement. Novus argues that Mr. Brockbank either still has an ownership interest in G.A.M.E.1, which is doing business as the "You Know Us Auto Glass" business, or that the benefits he receives from his wife and son-in-law operating "You Know Us Auto Glass" means that he is simply making an end-run around the non-compete agreement. As a result, Novus claims that Mrs. Brockbank and Mr. Palmer are aiding him in competing against Novus and should be enjoined from operating their business. In support, Novus provided the court with a June 1, 2016 application to the State of Utah Department of Commerce for the business name "You Know Us Auto Glass" that identifies the "Applicant/Owner" as Marilee Brockbank. Novus also provided the court with a June 7, 2016 summary of G.A.M.E.1's updated registered principals, which shows that Mr. Brockbank is no longer the President, Director and Registered Agent for G.A.M.E.1. Instead, Mrs. Brockbank is now the President and Registered Agent and that Mr. Palmer is now the Vice President and Director. Notwithstanding this documentation that reveals no involvement by Mr. Brockbank, Novus argues that because Mr. Brockbank himself has not provided documentation showing he is no longer an owner of G.A.M.E.1, he may still have an ownership interest. The court finds this to be a weak argument as Mr. Brockbank states that he relinquished his interest in G.A.M.E.1 and his affidavit goes on to state directly that "I have no interest in GAME."[11]  (Dkt. No. 27-1, p. 10).

Novus also provides a 1988 Warranty Deed identifying Matthew E. Thomas and Gary N. Brockbank as the owners of the building from which "You Know Us Auto Glass" now operates.

---

[11] Mr. Brockbank acknowledges that he will benefit from the income generated by his wife from the "You Know Us Auto Glass" business merely as a result of their marital relationship.

Additionally, Novus provides Utah DMV database records showing that Mr. Brockbank is the registered owner of three white cargo vans that have been parked outside of "You Know Us Auto Glass," one of which has allegedly been observed operating on behalf of the business in competition with the distinctly Novus-style mobile unit services. Novus asserts that Mr. Brockbank is providing "You Know Us Auto Glass" with the use of these assets at below market rate, thus violating the non-compete clause prohibitions on being "connected with" or assisting "any person or entity engaged in any other business that is in any way competitive" to Novus. (Dkt. No. 8-1, p. 44). The court has not yet been persuaded that Novus' non-compete contract can be extended to prohibit a former franchisee from leasing real and personal property to another auto glass business that is not using the Novus name or marks. Furthermore, Novus made no showing on the record that the vehicles are being leased at below market rates, and its source for the information about the real property being leased at below market rates, at this stage, is not credible.

For their part, Mrs. Brockbank and Mr. Palmer state that they never received or benefited from training or support from Novus while they were employees of Mr. Brockbank, and that they do not use any Novus marks, signs, equipment, chemicals, operations know-how or manuals, or any other confidential Novus system materials in running their business. Novus does not seem to suggest that Mrs. Brockbank has been trained in glass repair or replacement, stating instead that she has historically only done the accounting for the business on a part-time basis. Novus does not specifically assert that Mr. Palmer received Novus training, but does assert that he historically worked full-time in the business answering the phone, ordering product, and performing work in the shop (as contrasted to mobile unit work).

21

Novus provides evidence that on June 10, 2016 these defendants were still answering the phone as "Novus Auto Glass" and using Novus logos on their invoices/receipts, although plaintiff's own surveillance witness testified that by the end of June the business was using the new name and business signage and there was no evidence of Novus marks on the property. By the end of July, 2016, plaintiff's "mystery callers" confirmed that defendants were using the "You Know Us Auto Glass" name, but Novus claims that defendants have not taken enough steps to distinguish themselves from the former Novus franchise. Viewed as a whole to justify an extraordinary remedy, the court concludes that Novus has not made a sufficiently strong showing that Mr. Brockbank is violating the non-compete provision as to the glass repair business and, as a corollary, this failure prevents the court from finding that Mrs. Brockbank and Mr. Palmer are aiding Mr. Brockbank to violate the provision.

   e.   *Novus' asserted legitimate interests do not appear strong enough to support an injunction.*

Even if the court had concluded that Novus made a strong showing that defendants breached the non-compete clause, Novus would still have to demonstrate that it is seeking to protect legitimate business interests. *Anytime Fitness*, 2014 U.S. Dist. LEXIS 50337. The court thus considers the interests asserted by Novus.

First, Novus asserts that it is unlikely that a prospective franchisee would be interested in opening a new Novus center or operating a mobile franchise while defendants continue operating in the same markets, from the same location, using the same system, and with inside knowledge of marketing techniques, pricing and operational structure of a Novus franchised business. (Dkt. No. 16, p. 19). Upon consideration of the evidence, this interest appears either unsupported or too broad to succeed. The only evidence Novus presents regarding its failure to secure a new

franchisee is its talks with Mr. Brockbank's former subcontractors and Jim Perkins, one of the subcontractor's brothers, who would have to rely on the former subcontractors to run the franchise. The limited evidence before the court is that any reluctance by the former subcontractors to purchase or run a Novus franchise relates to the terms of Novus' offer, rather than fear of interference or competition from defendants. The record also shows that Novus' preferred resolution of their pre-termination conflict with Mr. Brockbank was for him to reduce his franchises to two, so that they could offer his subcontractors the opportunity to become Novus franchisees for the remaining six geographical areas. Novus' pre-termination expectation of being able to refranchise the majority of Mr. Brockbank's service areas, along with Novus' admission that their pre-termination discussions with Jim Perkins about this possibility led to Mr. Brockbank's termination as a franchisee, does not strongly support Novus' assertion that its re-franchising concerns are legitimate.

Furthermore, there is no clear and unequivocal evidence that any of the defendants are actually using the Novus system, marketing techniques, pricing, and/or operational structure such that other potential future franchisees would be disadvantaged by defendants competing in the same areas. The record shows that Novus has barely begun to explore re-franchising efforts with individuals and businesses who have no prior affiliation with defendants. And, while Novus claims that Mr. Brockbank's failure to assign the Novus phone number back to them is hindering their efforts to secure a new franchisee in the area, the contract already gives Novus the right to contact the phone company directly to reassign the phone number to themselves.[12] *Franchise*

---

[12] Novus claimed at the hearing that they had made efforts to act on their contract rights by contacting the telephone company to effect the transfer, but that Mr. Brockbank had transferred the number to Mrs. Brockbank such that the telephone company could not act under the authority of the rights outlined in the

*Agreement*, ¶ 21.3. Thus, an injunction may not be necessary if this is, in fact, required to assist Novus in securing a new franchisee and establishing them under the Novus brand.

Second, Novus claims a legitimate interest in having a two-year window of opportunity to locate new franchisees for this area and give them time to build a relationship with customers, unhindered by defendants' former customer relationships that were established under the Novus name (such as corporate fleets/insurance agent repeat business). (Dkt. No. 16, p. 19). It is undoubtedly true that defendants established some relationships with customers under the Novus name. The record does not reflect, though, that Mr. Brockbank actually acquired corporate fleet/insurance agent repeat business through the Novus name. The absence of any other Novus franchisees in the seven-county area of Mr. Brockbank's former territory suggests to the court that a new Novus franchisee who obtained corporate fleet or insurance agent business through Novus would not be competing with defendants for this business. And, importantly, Mr. Brockbank operated as a glass repair and replacement business beginning in approximately 1980, years before entering into a franchise relationship under the Novus name. He had already established customer relationships independent of his operations under Novus' name and mark. At least in the Bountiful area where there is a brick-and-mortar store, it appears that Mr. Brockbank had for some time established his own independent reputation and good will, although the court acknowledges Novus' concern as to this location being associated for no less than 15 years as a Novus franchise. As to the other counties served by the mobile repair units,

---

agreement. While Novus may ultimately be able to support this claim, the court concludes that Novus' last minute proffer of this information at the hearing, for the first time, only upon direct questioning by the court as to Novus' rights and obligations under the contract, does not meet the strong showing required to meet the heightened standard.

Novus has not presented evidence of long-term customer relationships established as a result of Mr. Brockbank acting under the Novus name that would interfere with a new franchisee.

Third, Novus asserts an interest in protecting Novus' proprietary system, which Novus alleges is enforceable even without territorial limits. (Dkt. No. 16, p. 20). This interest appears uncertain here, because the record before the court is hotly disputed as to whether the defendants ever actually used Novus' proprietary system; defendants further claim that they certainly are not doing so now and it is undisputed that defendants no longer have access to Novus' resin.

Fourth, Novus asserts an interest in preventing Novus' special know-how and brand-management information contained in its operating manuals alleged to be retained by the defendants from being used against any new Novus franchisee. (*Id.*). This interest is also not strong because the record before the court does not demonstrate that the defendants ever read or used Novus' operating manuals; furthermore, they have not retained them but returned them (even if to the wrong address) within a few weeks of Novus terminating the franchise relationship.

Fifth, Novus asserts an interest in maintaining the cohesion of and value offered to franchisees. (*Id.*). This interest appears too speculative to support an injunction because the record before the court does not reflect any clear and unequivocal evidence that the cohesion and value offered to Novus franchisees will be diminished if the court does not enjoin the defendants based on the facts at issue here.

Sixth, Novus asserts an interest in preventing other franchisees from the belief that they too can avoid performance of their contractual obligations and leave without consequences if they are not happy. (Dkt. No. 16, pp. 20-21). This interest also appears too speculative to support

an injunction because the record reflects defendant's denial of Novus' hearsay claims that he told anyone that a Novus franchisee could terminate its franchise or that Novus would not seek to enforce its rights under the franchise agreements. Furthermore, defendant acknowledges that he owes a debt to Novus under his former franchise agreement and that, subject to proper accounting, he intends to pay it. That fact, plus this litigation, suggests that any Novus franchisee observing Mr. Brockbank's franchise termination will be unable to reasonably develop the belief that a franchisee can escape his or her franchise agreement without consequence.

Finally, Novus asserts an interest in preventing loss of brand recognition, brand reputation, and a loss of collaboration that franchisees in different markets with different experience levels offer in the exchange of business intelligence about the Novus system if other franchisees follow Mr. Brockbank's lead to operate a competing business in violation of the non-compete agreement. (*Id.*). Again, plaintiffs have not supported this interest with facts that raise this concern past speculation.

It is important to note that there are a number of Minnesota cases involving Novus Franchising, Inc.'s injunctive relief requests against several franchisees that address the reasonableness of nearly identical non-compete clauses under nearly identical reasonableness standards. The Minnesota courts generally have found that the Novus non-compete clause is too restrictive and have modified it. *Novus Franchising, Inc. v. AZ Glassworks et al*, 2012 U.S. Dist. LEXIS 186996 (D. Minn. Sept. 27, 2012) (defendants could continue to operate a glass repair businesses as long as all references to Novus were removed); *Novus Franchising, Inc. v. Dawson*, 2012 U.S. Dist. LEXIS 103025 (D. Minn. Jul. 25, 2012) (defendants could continue to operate their glass repair businesses as long as all references to Novus were removed; Novus'

claimed inability to re-franchise the area was found to be speculative); *Novus Franchising, Inc. v. Dean*, 2011 U.S. Dist. LEXIS 33932 (D. Minn. Mar. 30, 2011) (defendants could continue to operate their glass repair businesses as long as all references to Novus were removed; very limited presence by Novus otherwise in Texas meant customers were not likely to be confused); *Novus Franchising, Inc. v. Oksendahl*, 2007 U.S. Dist. LEXIS 52016 (D. Minn. Jul. 17, 2007) (defendants could continue to operate glass repair businesses as long as all references to Novus were removed; claimed inability to re-franchise the area was speculative). These cases persuasively suggest that Novus' non-compete clause is likely too broad under Minnesota law to support the injunction they seek here.

As a final note, the court notes that the franchise agreement's Article 22.1 non-compete clause is extremely broad. It covers not just automotive glass repair, but building contract glazing products and services and any other glass products, repair, or services, construction-related or otherwise. Based on how Minnesota courts have restricted the Novus non-compete clause in similar cases when solely addressing automotive glass competition, let alone the broader glass-related competition envisioned by the non-compete agreement, it appears that Novus is not likely to succeed on such a broad restriction, even if Mr. Brockbank is found to have breached the clause.[13]

### 2.   Likelihood of Success on the Merits of the Trademark Infringement Claim

The court now considers whether there is a likelihood of success on the merits of Novus' trademark infringement claim. Novus alleges that defendants' use of the name "You Know Us Auto Glass," coupled with the use of the colors red and blue, a "swooshing" line and block

---

[13] At the preliminary injunction motion hearing, Novus indicated it was willing to abandon its claims as to glass products and services other than automobile glass.

lettering, and its "very similar" sound, infringes on its registered marks in violation of the Lantham Act. (Dkt. No. 16, pp. 21). The elements of a trademark infringement claim under the Lantham Act are "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce, and (3) that the defendant's use is likely to confuse customers." *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (internal quotations and citations omitted). Registration of a mark is prima facie evidence of the validity of a mark and the exclusive right of its use in commerce. *Id.*

"Likelihood of confusion is typically evaluated according to a six-factor test in which the court considers: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in using the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, (FAIR)*, 527 F.3d 1045, 1055 (10th Cir. Utah 2008) (citing *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964 (10th Cir. 2002)).

Considering these factors, the court concludes that there is not a substantial likelihood of confusion. To begin, the Novus logos and marks actually used at the former franchisee location differ significantly in font and overall visual appearance from the "You Know Us Auto Glass" logos. The appearance of the Novus marks is shown below:






By comparison, the "You Know Us Auto Glass" marks appear as follows:




Novus has argued not that the "You Know Us Auto Glass" marks are similar to the Novus marks

above that were actually used by the former franchisee, but that they are similar to what it calls

Novus' "old logo." *Aff. of Keith Beveridge in Support of Mtn. for Prelim. Injunction*, p. 4. The

"old logo" is shown below:



Novus has not asserted, however, that Mr. Brockbank ever used the "old logo" when operating as a Novus franchise, or even that the above mark is Novus' actual trademark. Furthermore, the court notes that other than the use of the same font for the "Novus" name in both the "old logo" and the marks used by the former franchise, there is not much similarity between Novus' "old logo" and the Novus marks actually used by Mr. Brockbank. The court concludes that it must evaluate potential confusion due to similarity based on the marks Mr. Brockbank actually used when operating as a Novus franchise.

One Novus sign actually used by Mr. Brockbank was block-like, entirely in blue, and had design elements such as a shooting star and the suggestion of a mountain and/or moon. Another had the same Novus font on a blue background, Novus' byline of "The Windshield Repair Experts" beneath on a red background, and horizontal and diagonal geometric lines. The former Novus awning used by Mr. Brockbank had white text in the Novus font on an entirely blue background with red accents, whereas the new awning used by "You Know Us Auto Glass" uses blue and black text on a white background with blue as the underlying color, and the words "Auto Glass" are featured much more prominently than "You Know Us." Additionally, the introduction of a script or handwriting-like font for the word "You" is a substantial departure from Novus' font choices.

The differences in the business card designs are similarly substantial, and reflect general simplicity on the part of "You Know Us Auto Glass" as compared to the Novus marks formerly used by Mr. Brockbank's franchises.

 

Novus argues that the "You Know Us" name was not randomly chosen but was intended to imply that nothing has changed from when Mr. Brockbank operated a business under the Novus mark. Furthermore, Novus alleges that the name supports an inference of likelihood of confusion and creates the expectation that work performed by the business will be the same quality as when it operated as a Novus business, even though defendants are no longer eligible to purchase the proprietary supplies.

Overall, the court finds that the "You Know Us Auto Glass" logo conveys a more personal, rather than corporate appearance, which appears to support Mrs. Brockbank and Mr. Palmer's assertion that the intent behind the name choice was to reflect their personal involvement in their community and the community's knowledge of them, rather than supporting Novus' allegation of an intent to deceive customers and infringe on the good will or reputation of the Novus brand. Novus has not presented any direct evidence to support their allegation of defendants' intent, or even that defendants ever used Novus' proprietary resin. To the extent Novus asks the court to infer that defendants' marks are intended to deceive customers, the court

31

finds that the dissimilarity of the marks weighs against such an inference. *See Hornaday Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014) (holding that the fact of defendant's adoption of a dissimilar mark weighed against a finding of intent to deceive, notwithstanding evidence that defendant was aware of plaintiff's mark). Neither party has made substantial arguments regarding strength or weakness of the marks or about the degree of care likely to be exercised by consumers.

Novus also argues that "You Know Us" sounds the same as "Novus" when spoken, contributing to customer confusion. Defendants argue that while "know us" sounds similar to "Novus," their name is not "know us" but "You Know Us" and that the addition of "You," which is pronounced first and makes the name longer, renders the sound sufficiently different when spoken. The court acknowledges that the services provided by Novus and "You Know Us Auto Glass" are similar. But, while the court finds that the sound of the names is a closer call than the appearance of the signs and logos, Novus has not presented sufficient credible evidence of any person, customer, or supplier who has been actually confused about whether the sound or the appearance of the "You Know Us Auto Glass" name and mark is related to the Novus brand.[14] Upon consideration of all the relevant factors addressed above, including the dissimilarity of the appearance of the marks, the failure to demonstrate deceptive intent behind adoption of the mark, and the lack of evidence of actual confusion, the court finds there is not a substantial likelihood that Novus will prevail on its trademark infringement claim.

---

[14] The court has concerns about the foundation and potential ethicality of the "mystery caller" transcripts presented by Novus in support of its claim of customer confusion.

### 3.  Likelihood of Success on the Merits of the Trade Secret and Confidential Information Claim

Finally, Novus has not established a substantial likelihood of success on the merits of its trade secrets and confidential information claim.[15] The Minnesota Trade Secrets Act defines trade secrets as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Minn. Stat. §325C.01, subd. 5. Use of a trade secret by a person who had a duty to maintain secrecy can be a misappropriation of the trade secret. Minn. Stat. § 325C.01, subd. 2, 3(i) and 3(ii)(A). Additionally, "[n]ondisclosure clauses are strictly construed and enforced *only to the extent reasonably necessary to protect the employer's interest in confidential information*." *Overhold Crop Ins. Service Co. v. Travis,* 941 F.2d 1361, 1368 (8th Cir. 1991) (emphasis added) (use of customer data restricted pursuant to confidentiality clause). To succeed on a misappropriation of confidential information claim, Novus must show that "confidential information has or will be misappropriated through its improper disclosure or use."  *Katch, LLC v. Sweetser*, 143 F. Supp.

---

[15] For purposes of Novus' motion for a preliminary injunction, the court construes Novus' trade secret claims as claims regarding the content of its operations manuals. The operations manuals and their content are subject to confidentiality provisions in the franchise agreement. Accordingly, pursuant to the franchise agreement, the court applies Minnesota law to these claims.

3d 854, 869 (D. Minn. 2015).[16]  On this record, the court finds that Novus has failed to strongly

show sufficient evidence to support a substantial likelihood of success on these elements.

Novus alleges that their techniques and processes for windshield repair, submitting

insurance claims, marketing insurance claim submission to consumers, and selling techniques

specific to the business constitute trade secrets and confidential information. The franchise

agreement has a provision that requires confidentiality of the operations manual and other

proprietary information about the Novus business system, *Franchise Agreement*, Article 7.2-7.4,

and another provision that requires the return of the operations manual. *Id.*, Article 21.1-21.2.

Novus argues that their operating manuals, data, and know-how are either trade secrets or

otherwise protected by the confidentiality clauses contained in the Franchise Agreement. They

presume, and ask the court to presume, that defendants are "using" the information and cannot

operate any kind of glass business without use of the information they allege defendants acquired

solely from them.

Novus has failed to provide the court with sufficient detail for the court to determine

whether its proprietary resin meets the requirements to qualify as a trade secret. Even assuming

those requirements could be met, there is no allegation that defendants knew or disclosed the

formula. It is also undisputed that defendants are not currently using the proprietary resin

---

[16] "Where there is only a threat of misappropriation," Minnesota courts require the moving party to "demonstrate a high degree of probability of inevitable disclosure." *Katch*, 143 F.Supp.3d at 869. "Mere knowledge of a trade secret is not enough, even where the person with such knowledge takes a comparable position with a competitor. An injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights . . . injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Id.* at 870 (internal quotations and citations omitted).

available only to Novus franchisees. As to the resin itself, the court finds no evidence to support a claim for misappropriation of a trade secret or confidential information.

Further, the court has not been persuaded that Novus' windshield repair processes, insurance claim submission and marketing/selling techniques are not readily ascertainable to others and thus protectable as trade secrets. Even if they constitute confidential information, the evidence weighs against finding that defendants have misappropriated it. The record shows conflicting evidence about whether and how long Mr. Brockbank was operating a glass repair and replacement business before ever becoming a Novus franchisee. Mr. and Mrs. Brockbank allege that they were already trained in how to perform their business, and have both asserted that Novus did not provide them with any training when Mr. Brockbank became a franchisee. Novus merely makes conclusory statements otherwise and claims that training was available for franchisees including Mr. Brockbank at regional meetings and annual conventions. (Dkt. No. 33-1, p. 4).

And, while it is undisputed that Novus provided operations manuals to Mr. Brockbank when he became a franchisee, all of the defendants have denied that they ever read or used them. Furthermore, Mrs. Brockbank shipped the operations manuals to Novus in mid-June, within a few weeks after Novus terminated Mr. Brockbank's franchise, albeit to Novus' former corporate address. Novus has not presented any evidence that the misdirected manuals are or will be used or disclosed by others, and even if such evidence existed, an injunction against defendants will not prevent that use or disclosure.[17] Thus, Novus' failure to provide sufficient evidence that

---

[17] At the hearing, Novus stated that the new tenants of Novus' former corporate offices regularly receive deliveries intended for Novus, and typically return them to the shipper. Beyond that, they could only

defendants are using or disclosing its alleged trade secrets or confidential information renders its misappropriation claim unlikely to succeed.

### B. Irreparable Harm

To prevail on its motion for a preliminary injunction, Novus must show that it will be irreparably harmed if an injunction is not granted. This is demonstrated by showing "a significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citations omitted). A demonstration of "purely speculative" harm is not sufficient, and the "significant risk of irreparable harm" must be likely to occur. *Id.*

Novus argues that it will be irreparably harmed by defendants' ability to use its knowledge and customer relationships gained as a Novus franchisee to impair Novus' goodwill and ability to refranchise and retain the market presence it once had in the area. It also argues that its ability to uphold its franchise agreements with other franchisees will be undermined if Mr. Brockbank is allowed to simply transfer "operations to his spouse and step-son and cheekily and cleverly" twist the Novus mark and name. (Dkt. No. 33, p. 12). Novus also asserts that it needs time for former customers to disassociate Novus from defendants' business and transfer their business to a new Novus franchisee. Finally, Novus argues that irreparable harm is presumed when there has been trademark infringement and a misappropriation of trade secrets.

The court has already concluded that Novus has not made a strong showing of success in its trademark infringement and misappropriation of trade secrets claims, which undermines any presumption of irreparable harm. Beyond that, other courts who have addressed these claims of

_____

speculate about whether the deliveries were returned to sender, forwarded, or end up abandoned in a warehouse.

irreparable harm by Novus have rejected them. *See e.g.*, *Dawson*, 725 F.3d at 895 (affirming the district court's rejection of the same irreparable harm claims Novus makes here); *Oksendahl*, 2007 U.S. Dist. LEXIS 52016 at *4-5 (holding that Novus' claim of irreparable harm to its goodwill, loss of customer relationships and inability to refranchise the franchise area was speculative); *Dean*, 2011 U.S. Dist. LEXIS 33932 (holding that Novus' claimed harms of loss of goodwill, inability to refranchise and injury to its entire franchise system are too speculative to constitute irreparable harm.)

Novus also directs the court's attention to its prior ruling in *Bad Ass Coffee Company of Hawaii, Inc. v. JH Nterprises, LLC*, 636 F. Supp. 2d 1237 (D. Utah 2009) as an example of how a franchisee's intentional breach of the franchise agreement constitutes irreparable harm to the franchisor's relationships with other franchisees. (Dkt. No. 16, p. 27.). Although Novus correctly quotes the case's language about the franchisor's potential harms the court foresaw without an injunction there, it fails to note that the determination by the court is always on a case-by-case basis based on the facts of each situation. *Id.* at 1247. The equities that the court must evaluate here are not the same as those the court considered in *Bad Ass*. For example, in *Bad Ass*, the evidence there showed that defendants had no prior experience owning or operating a coffee store prior to becoming franchisees, and had no prior relationships with customers, suppliers or distributors. *Id.* at 1239. Here, Novus has not clearly demonstrated that defendants had no independent training in glass repair and replacement, or that they had no customer, supplier, or distributor relationships prior to and independent of Novus' assistance or marketing. Additionally, in *Bad Ass*, the record showed that during the franchise term, defendants deliberately planned and prepared to set up a competing coffee business in the same location

immediately upon routine expiration of the franchise contract without providing plaintiffs notice that would allow them to exercise their contractual right to acquire defendants' lease. *Id.* at 1242-43. There are no similar facts here, where the parties dispute the royalty payments owed, and where plaintiffs terminated defendants' franchise early with the expectation of replacing Mr. Brockbank's franchise with his former subcontractors or by a current Las Vegas franchisee who in turn intended to rely on the same former subcontractors.  Novus now blames the failure of their expectation on Mr. Brockbank's "intimidation" of his former subcontractors, but the court does not find that Novus has strongly shown such intimidation occurred or that Mr. Brockbank is otherwise the source of the harm they now claim to be experiencing. This factor therefore weighs in favor of the defendants.

## C.  Balance of the Injuries

The balance of hardships factor also weighs against granting a preliminary injunction in this case. While Novus alleges that its restrictions are not more harmful than necessary because defendants have "ample alternative employment opportunities" and its two year and geographic area restrictions are not too restrictive, this does not appear to be the case. Novus has two other franchises in Utah, one in Logan and one in St. George. Excluding those two county areas, the seven-county area Novus seeks to restrict is so broad that it would effectively eliminate the opportunity for Mr. Brockbank and his wife to operate an auto glass business in any area of sufficient population density in Utah.[18] Because the population density is too low in the remaining unfranchised counties, enforcing Novus' restrictions would essentially require

---

[18] Excluding the 9 county areas where Novus franchises operate or formerly operated in Utah, the remaining 20 counties in Utah contain only approximately 12% of the entire state's population, even though they make up over 80% of the geographic area of the state. *County Population, Utah* and *County Area, Utah*, 2010 census data, www.onlineutah.com/countyarea.shtml (last visited Sept. 2, 2016).

defendants to uproot their lifelong connections to Utah and move to certain parts of Wyoming or the other relatively limited geographic areas in which Novus claims defendants would not be competing with other franchisees. The harm to the defendants from enforcing this restriction appears to outweigh Novus' interest in restricting competition in the most heavily populated areas of the state where Novus has nearly no other presence.

Defendants argue that not only will an injunction cause them severe and certain harm as compared to the speculative and uncertain damage that Novus claims, that Novus itself would be harmed if an injunction were to issue.  This is because Mr. Brockbank would lose the livelihood that will enable him to repay any unpaid balance he still owes Novus. Mr. Brockbank argues that due to his and his wife's ages (58 and 63, respectively) and their involvement in the auto glass business throughout their lives, they are unlikely to be able to find alternate employment in another industry that would pay them enough to meet their living expenses, let alone the $98,000 line of credit Mr. Brockbank acquired to support the business plus the amount he still owes to Novus. Mr. Brockbank anticipates having to file for bankruptcy if forced out of the auto glass business. Similarly, from the time Mr. Palmer graduated from high school, he has worked exclusively in the auto glass repair business, and although he is younger and potentially more able to obtain replacement employment, would still likely suffer a substantial cut in salary if forced to start at ground level in another industry. Defendants also express concern about their four employees who would also lose their jobs and be forced to search for alternate employment if an injunction is entered.

These harms appear to be certain and severe as to the defendants. By contrast, the court has found much of plaintiff's alleged harm to be speculative. Plaintiff claims that defendants'

harms are self-inflicted and thus should not weigh in defendants' favor. On the record here, however, the court is concerned that Novus' claimed harms are similarly self-inflicted and should not weigh in their favor. While development of the record after discovery may ultimately support Novus' claims, the factual disputes in the record prevent the court from finding that Novus has satisfied its heightened burden with regard to the balance of harms between the parties.

**D. The Public Interest**

Finally, the court finds that where, as here, plaintiffs have not strongly shown a likelihood of success on the merits and with regard to the balance of harms, it is not in the public interest to grant the preliminary injunction.

### III.    CONCLUSION

For the reasons stated above, the court DENIES plaintiff's motion for a preliminary injunction. (Dkt. No. 16).

DATED this 8th day of September, 2016.

BY THE COURT:

Clark Waddoups
United States District Court Judge